Thank you, Your Honor, and may it please the Court, I'm Jennifer Garcia from the Federal Defender's Office for the District of Arizona, representing the petitioner in this matter, Mr. Kayer. With me at council table is my co-counsel, Emma Smith. This case is before the Court following the denial of Mr. Kayer's habeas petition by the District Court. With the Court's permission, I'd like to focus on two issues today. Claim 2 in the opening brief regarding the ineffective assistance of Mr. Kayer's counsel at sentencing, and Claim 1 regarding the Arizona Court's application of an unconstitutional causal nexus requirement to the mitigation presented in the trial court. I'd like to begin by addressing the two cases that were listed by this Court in its order shortly before the previous oral argument date in this case, which would be Woodford v. Viscotti and Porter v. McCollum. And those cases, I think, are an excellent comparison to this one, both with some similarities in the factual background of the cases and the legal analysis. But those two cases really come down to the way the state courts handled the evidence presented in the post-conviction proceedings. And I think that's very much where the difference lies in the analysis of the two cases. For an example, in Mr. Porter's case, like that of Mr. Kayer, there was a great deal of additional mitigation evidence that was offered during the post-conviction proceedings as compared to the trial court. However, when looking at what the state court did in its analysis of that evidence, as the Supreme Court pointed out in Porter, the PCR court had unreasonably discounted that evidence into irrelevance in making its decision that there was no prejudice from the absence of that information at the original proceeding. In Viscotti, by contrast, in that case, the state courts had written a lengthy, reasoned order going through all of the evidence that was offered in mitigation and in aggravation, discussing it in its totality, looking at whether or not there was prejudice by properly assessing the disparity between the evidence offered at the original sentencing and the post-conviction proceeding, and making a determination that the new evidence did not undermine confidence in the outcome. So, again, unlike what happened in Porter and in Mr. Kayer's case, the state court there provided ample evidence outlining the reasoning behind its decision. And as a result, the state court decision was objectively reasonable in that case. However, here, if you look at the state court's order following the post-conviction hearing and deciding this claim, the prejudice part, I think, is even more stark in that the court simply states that it does not find that Mr. Kayer has proven prejudice under Strickland and lists, you know, the few factors that were offered, the factors that were offered just in a list, and then that's the end of its analysis, and does not go into any kind of detail about the difference between those factors, then what was offered at trial, or any kind of an analysis of why it believed Mr. Kayer had not shown prejudice. Counsel, I was curious, in Porter, the mitigating evidence is very striking. I mean, this was a fellow who was wounded, I believe, twice in the Korean War, and had these just, a whole host of awful things in his life. I'm still having trouble understanding what was the, I'm saying it has to be as striking as it was in Porter, but for Mr. Kayer, what is the, I hate to use Korean War equivalent, but help me understand, what is out there that should have been before the trial judge that wasn't? Absolutely, Your Honor. I agree that there's nothing as immediately striking as the Korean War example. I don't think that's the test. That's not the test. Thankfully, that's not the test. I think, in Mr. Kayer's case, the part of the story that is most compelling is his bipolar disorder, and when you look at the evidence that was presented during the post-conviction proceedings, Mr. Kayer started displaying symptoms consistent with mania and depression as far back as his early childhood. It explains absolutely everything that has happened to Mr. Kayer in his life. The decisions he made, the actions he took or didn't take, everything is very easily explainable in the context of that bipolar disorder. It explains, the different manic periods explain why he had trouble in school, despite the fact that he is certainly of average intelligence. There's no immediate reason why he couldn't have succeeded in school, but due to his periods of mania and depression, he couldn't concentrate. He couldn't finish. He didn't end up graduating with a degree, and throughout, he had trouble holding jobs. He was in and out of the Veterans Administration Hospital. He joined the military himself and had a hard time in the military, again, related to what was likely symptoms of depression during that time. And discharged from the military basically on account of that? Yes, exactly, Your Honor. He didn't receive a dishonorable discharge, but I think that they realized that his mental health conditions were prohibiting him from being successful, so he was essentially dismissed from medical school. What impact, if any, did that heart attack have, and what kind of evidence was presented to the trial court with respect to the heart attack? From my understanding of Mr. Kher's life, I believe the heart attack had a profound impact on him. In the first instance, his father died at a very young age of a heart attack, and as a result, Mr. Kher grew up without having a father present in his life, raised largely by his mother as a result. So when Mr. Kher had his heart attack, it seems pretty clear from the expert reports that were offered during the post-conviction proceeding and the various mental health reports that are in the record in this case, that Mr. Kher was very shaken by it, and I think it certainly played into his mania, his paranoia, the other mental health conditions that he has. How long before the crime was the heart attack? Oh, you know, I'm not sure if I have the date directly in front of me. A few years. Let me give you the exact date. Never mind. You can give it to me. Thank you, Your Honor. I will definitely give it to you. But I do think it appears that it threw Mr. Kher into somewhat of a tailspin, and I think when you compare the, when you compare his behavior after the time of the heart attack to, you know, his behavior before that, it certainly seems that the heart attack played directly into his mania and the conditions that accompanied that, including his own pulsivity, his paranoia, the other... How strong was the evidence that he heard voices? Your Honor, he, I'm not sure there is evidence that he heard voices other than his own self-report. It's always self-report. Nobody else ever hears the voices. And his aunt says that he had told her that he had been hearing voices. Yes, that is correct. Normally, in order to support a case where a defendant might be schizophrenic or psychotic and hear voices, in order to support that, you know, often you need expert evidence of a defendant responding to, you know, invisible stimuli or a long history of a report of that. There is definitely some evidence in the record, both from Mr. Kher and from family members talking about the fact that he had heard voices or had similar incidents at various points in his life. To my understanding, no expert has found the voices that he did hear to rise to the level of a delusional disorder diagnosis or a schizophrenia, but that, of course, doesn't mean that he, that is not an issue for him. You're going to, I assume, hear, we're going to hear it from the State that his Eddings claim or causal nexus claim  because he didn't present it under Criminal Rule 32 and asking for re-hearing from the Arizona Supreme Court. It strikes me, though, that the Arizona Supreme Court did its weighing of mitigating and aggravating circumstances on its own. This is a de novo. So it makes its own error. It's not reviewing an error by the trial court. It makes its own error. Assuming that the Arizona Supreme Court is making its own error, is it a requirement under Arizona law that is consistently applied for purposes of review and exhaustion that you have to get re-hearing in the Arizona Supreme Court? No, Your Honor. I will frankly tell you I don't know of another claim arising from Arizona in which it is exhausted solely by means of a motion for reconsideration coming from the denial of the direct appeal. It must be exhausted by that mechanism. Exactly. I'm not aware of another claim that requires that for exhaustion purposes. And that would mean, then, that if it is exhausted, but, of course, not reached by the PCR court, that we review de novo the finding of harmlessness on the Eddings error? Yes, Your Honor. If we were to review for harmlessness under the IAC claim? Yes, Your Honor. The district, the PCR judge, I don't know how to pronounce it, Judge Kiger, says harmless error. Is that one reviewed for harmless error? Is that one reviewed de novo or under EDPA? As to the IAC claim? The prejudice with respect to IAC. The prejudice with respect to the IAC, it's sort of a mixed analysis because first we have to meet the strictures of 2254D. We have done that, I think, on several grounds as far as the IAC claim. Now, speaking only for myself, I think Judge Kiger was demonstrably and sufficiently wrong under EDPA with respect to deficient performance. Ms. Williamson doesn't do a darn thing for a year and a half. The others don't do anything until very late, and at that point the game is almost entirely lost. Yes, Your Honor. So for me the question is prejudice, and I'm trying to figure out as an initial matter whether I have to defer under EDPA to Judge Kiger's conclusion that there was no prejudice on IAC. Under EDPA, yes, you would have to defer to it unless you have found that Mr. Kerr has met one of the subsections of 2254D. However, once he's met one in any capacity, this Court's review is de novo. So help me understand that. For example, if the Court believes that Mr. Kerr has shown that the state PCR court unreasonably applied Strickland in its deficient performance finding, made an unreasonable determination of facts or unreasonably applied the law in the deficient performance setting, once the Court has found that D has been met, then the review of the rest of the claim is de novo. Do you have a case for that? If it's okay with the Court, I'll provide it during my rebuttal. I'm skeptical that you're right on that. I'm sure that I have some authority for that, Your Honor. But yes, once D is met, then the review would be de novo. Yeah, I mean, that's a fairly significant question. I'd certainly like to know if you have an answer that says that because there's an error in the performance part, that that means prejudice is decided de novo. Yes, Your Honor. The theory is once the district judges demonstrate that he can't follow federal law on one question, he can't follow federal law on another one? Again, I'm sorry that I can't provide you the citation off the top of my head. I think it's my understanding that the analysis is based on it's one claim. It's an ineffectiveness claim. So even if the claim is broken into two parts, for example, like an ISC claim would be, or perhaps a Brady claim, that it's one claim. So if the state post-conviction court has been unreasonable in its analysis of that claim, then the claim itself is reviewed de novo. It's not broken into the different subparts. Now, if we're evaluating harmlessness with respect to IAC, what are we comparing to what? Meaning, are we comparing the evidence presented at the actual hearing with the evidence that was presented in the PCR hearing? I think that's right. If we're evaluating harmlessness with respect to the Eddings error, are we evaluating only the evidence presented at the original sentence hearing, one comparison being with it excluded because of the Eddings error and the other with it included once the Eddings error is gone? Yes, Your Honor. I think that that's exactly the analysis. Yes, I think that's exactly what I would say as far as the difference between the two. Yes, as to the McKinney claim, it would be the difference between what was offered and what was actually found based on the exclusion due to the nexus. And if we find Eddings error, we send it back for sentencing, and it will be a judge resentencing, correct? No, Your Honor, it would be a jury. Since Ring, any of the cases that have come back for resentencing, even if they were initially sentenced by a judge, because the law of Arizona now requires sentencing by a jury, once his sentence was no longer final, he would receive a jury sentencing. You know, I'm afraid that's wrong. I wish you were right. Don't say that. It would affect a lot of cases. Well, we decided that Arizona could resentence by a judge. There was an en banc call that failed. My recollection is that the Arizona court on remand for Eddings error does resentencing based by a judge rather than a jury. On the remand for the cases that I'm aware of currently that have been reversed due to the Eddings error, in those cases the claim involved error by the Arizona Supreme Court itself, specifically during the independent review process. And I think in those cases what has happened is that the attorney general's office has asked the Arizona Supreme Court as the remedy to reopen the direct appeal and perform a constitutionally correct independent review. I see. And here the error certainly occurred as well in the trial court, and because the Arizona Supreme Court reviews the record created by the trial court, they essentially just compounded the error when they made it themselves again in the independent review. Okay. Well, I'll leave that alone. That's not directly relevant to how we decide the case in front of us. And if we want more information on that, I guess we can ask the parties. Thank you, Your Honor. If the court doesn't have anything further, I'll reserve the remainder of my time for rebuttal. All right. Thank you. May it please the court. John Todd representing the respondent in this matter on behalf of the Arizona Attorney General's office. Good afternoon. The court asked our opinion of the impact that Porter and Viscotti might have on this case. And I think those two cases illustrate a very important point, and that is that there is a direct line between the type of homicide we're involved with and how we evaluate the mitigation. Porter says, and it's quoting Riggins and Penry, defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable. That is attributable to a disadvantaged background. And they applied that in Porter. They applied that by, they looked at the crime, and it was a crime of passion, as the state court found. It was a crime of passion. And then they looked at his background and talked about the violence of his upbringing and then related it directly to his abusive relationship with his victim. In contrast, in contrast, in Viscotti, the crime was a planned murder. It was premeditated, it was planned out, not unlike in Kher's situation. And there the court looked at the background and found it not terribly significant as an impact on the crime. And so I think the lesson we can draw from both those cases is that there is a direct relationship to what occurs in the homicide and how a court appropriately evaluates the mitigation. There's a, you know, you're looking at two parts in these cases. You're looking at the relationship between the mitigating evidence and the aggravating evidence. And in Porter, or in Viscotti, you had very extreme aggravating circumstances. You had, for instance, it was heinous and deprived, which the court said in this case it was not. You had violent stabbings, as is other crimes. In this case, the other, single other crime was not violent. So there the aggravating circumstances were overwhelming and devastating, the court said. So it's not very comparable to here, where there's a single murder and one single prior offense, which was nonviolent. Well, the court found, the Arizona Supreme Court found, that here, that the aggravation clearly outweighed the violence. That's right. That the crime was obviously premeditated. He went back and after he flew. Well, that's because that's the issue here. He went back. Just a minute. That's the issue, that it clearly outweighed the mitigating circumstances as they were presented. It didn't say it clearly outweighs the mitigating circumstances as they could have been presented. Well, the trial judge found, after an exhaustive hearing, that the additional evidence was de minimis. So it didn't change the structure. Well, what I'm saying is in Viscotti, the aggravating circumstances were extreme, extremely bad, very bad aggravation. Here, it was very little aggravation. It was minimal. And so what are you weighing that against? That's the mitigating. I'm sorry. Yeah, go ahead. I think I read Viscotti differently than the court does. It's a question of reading it differently. They said in Viscotti that the aggravating circumstances were extreme. The crime was heinous and depraved. And here they said the crime is not heinous or depraved, specifically. I mean, that's not reading it anyway. The prior offenses in Viscotti were overwhelming. These are the court's words, not mine. Overwhelming and devastating for these aggravating. His prior offenses were violent stabbings, including a pregnant woman. The prior crime here was a nonviolent crime. Well, he was armed with a gun, and it was a burglary, first degree. It didn't stab or injure anybody or wound, let alone violent stabbings, including a pregnant woman. I mean, I don't think you could really say, honestly, there was any comparison between the extremely strong aggravating circumstances in Viscotti and the weak circumstances here. It was the crime plus one prior crime. And this was not an unusual offense. This was not one of those extreme, you know, vicious killings. It was just a sort of normal murder. Going to Judge Fletcher's question, the McKinney error, as I understand it, occurs when the Arizona Supreme Court applies a bar that prevents it from considering certain evidence. That the way to overcome that bar would be to, as the rules provide, under Arizona law, and did at the time of Kerr's case, to move for reconsideration. In fact, the comment to the rules at that time specifically says that if the court brings up something that hadn't been argued before by the parties, that they can, that's a grounds for moving for reconsideration. They may move. Doesn't say must. Does not say must. That's left up to the attorney. In this case, the attorney did not. It was the rule consistently applied in Arizona that if a Rule 32 motion for reconsideration was not made, that any claim that might have been made, but I'm asking was that the rule consistently applied in Arizona at the time? Well, the motion for reconsideration is under Rule 31, not Rule 32. The Rule 32, in this case, we have a finding, a finding and preclusion under Rule 32. I'm not asking about this case. I'm asking, rather, was the preclusion rule applied by this judge under Rule 32 consistently applied in Arizona at the time? Let me try to answer that question, because I think there's a disconnect. There is no question that finding a preclusion is a regular procedure. It's not recognized, barred by the United States Supreme Court. I understand that. I'm asking what happened in Arizona. I understand that, Your Honor. What I'm trying to explain is that there, if a defendant fails to move for reconsideration on this type of issue, and then tries to raise it back in a Rule 32 proceeding, it would be found barred as a normal, regular course. And you're representing to me that the Arizona courts were consistent in applying the rule in that fashion? As to my knowledge, they were consistent. And what do you mean to your knowledge? I mean, there may be some cases out there you don't know about. I'm sure there are a lot of cases out there I don't know about. I mean, this is an important question, because under the established rules by this Court and by the Supreme Court, a procedural bar, if not consistently applied, cannot be used as a procedural bar to preclude this. My understanding of the law, Your Honor, is that it doesn't have to always be applied. Well, you're wrong on that, then. It has to be consistently applied, otherwise it cannot serve as a procedural bar. I thought there was a U.S. Supreme Court case that indicated that it doesn't have to always be applied. Well, we can look up the law, but the rule is that if it's not consistently applied by the State court, and it cannot be applied selectively and then act as a procedural bar presenting Federal review. So we can look up the Arizona law to see. But assuming that the Rule 32 preclusion rule applied by this Court was not consistently applied at that time, we have exhausted, and then I think we're de novo. Does that follow in your view? No, I don't. May I ask you to assume that the if, and you don't have to concede that it was, so if it was not consistently applied, I don't believe that's the legal standard, Your Honor, under the more recent U.S. Supreme Court cases that understand that the State court can have some discretion in applying its rule. Okay, so let me do it this way, because I think you and I have exhausted the point on that as far as we can go. But if we assume that it has been exhausted, which I do not here ask you to concede, but it was not decided by the State court, do we review de novo his ruling on Eddings? See, if I understand you, Your Honor, if there was no bar. If there's no procedural bar, but the PCR judge nonetheless doesn't decide the Eddings question, is our review of the Eddings question de novo? There's been no court ruling on the Eddings question. No State court ruling on the Eddings question, correct. And it's been exhausted. How is it before you if there's no State court ruling? Well, the questions are presented to the State courts fairly frequently that they don't decide. And then they come to us to ask us to decide them. And the rule is we decided de novo if the State court had it properly presented to them. And they didn't decide it. We get to decide it, and we decided de novo. If it was properly presented to them. Well, I just asked you to assume that it was exhausted. Okay. Okay. I'm sorry. I misunderstood. Okay. I didn't ask you to concede. I asked you to assume. Sure. I understand, Your Honor. Okay. So it would be de novo in that circumstance. Yes. Okay. I got it. Now, if we do it de novo on Eddings, I assume what we're comparing is the evidence that the trial judge and the court of the Arizona Supreme Court actually considered in sentencing, which was very restrictive because of their application of the causal nexus rule, and compare that to that evidence considered as mitigating evidence. That's the comparison? Well, I think, as you recall, that there's sort of two steps in the sentencing mitigation sentencing process in Arizona. The first step is the defendant has to prove by the preponderance of the evidence that the mitigator, in fact, exists. The second step is how they weigh that proven mitigator, how much weight they give to it. In this case, I think the record shows that the only mitigation that the trial judge and the Arizona Supreme Court found that was proven by the preponderance of the evidence was Kayer's relationship, love of Tato, his son. I don't believe they found any other mitigator was, in fact, proven. So that's besides the point of the McKinney error, any McKinney error. Okay. Well, I would have to go back and reread, but as I read both what the trial judge said, the sentencing judge said, and the Arizona said, there was no evidence of the connection. But I don't think they said it wasn't proved, for example, that he had these various the testimony as to the mental problems he'd had. There was testimony that was uncontradicted as to the mental problems. Well, I think the judge found that the testimony was speculative. It was not substantial that the, and then he said in addition, in addition, there was no requisite causal connection. So there were two findings there. Okay. Again, this is in a sense off the point, but I'm interested in the procedure. Sure. It was represented to us a moment ago that when we send cases back for Eddings error, that they're retried to a jury for sentencing. Is that your understanding of what happens? No, Your Honor. What does happen? My understanding, based on the case, Steyer's case, is that this court, it's on my understanding that the error occurs at the Arizona Supreme Court level. That that's at the point where the error occurs. And therefore, it is the Arizona Supreme Court has the opportunity to correct it. And so the case goes back to the Arizona Supreme Court to correct the error that they purportedly made. Yeah. Yeah. I'm afraid that's my understanding of what happens now. Yeah. Yeah. Okay. As we look at the IAC claim, the PCR judge, Judge Kiger, is that how you pronounce it? I believe so, Your Honor. Said there was no deficiency in the performance. Do you agree with that? Yes, I do. After the year and a half investigation and the $100,000 of mitigation expense, they came up with nothing significant in terms of the difference. That sounds like we're talking prejudice, but I'm asking performance. There was zero, essentially zero investigation by Ms. Williamson. And then the only investigation done by the two people who come later, Stoler and Victor, comes very late. Well, part of the Strickland analysis, as this Court's well aware, is that you have to look at the circumstances and judge the attorney's performance if it was reasonable given the circumstances. Right. Here, the Court, the Chief Judge of Yavapai County, would not give any funding for a mitigation specialist until there was, in fact, a verdict of guilt on the murder. Well, Ms. Williamson didn't even ask for it for a year and a half. It was only when the later lawyers asked for it. Mr. Victor asks for it in January. That's correct. And is denied. I think the State Court is to be faulted for refusing to give it at that time. I think the lawyers are to be faulted. I mean, Williamson has some money. She's not spending any money. She's basically waiting for the other witness to die or to recant or go away or, you know, have a hallucination, which is fantasy land as far as I'm concerned for strategy. But she does nothing. She doesn't even talk to K.A.R.E. to say, hey, you know, we better get started here. There's nothing that happens. Well, she does communicate with K.A.R.E. She does file motions. She does get a Rule 11 examination. But she does nothing really to look for family history. The normal things in mitigation she just doesn't do. No. She doesn't even start. But Strickland never held. And the U.S. Supreme Court in Penholster specifically says there's no absolute duty for an attorney to begin an investigation. It goes back to Strickland. What is reasonable under the circumstances in her judgment that the best chance on this, to prevail in this murder case was something to happen to the State's key witness? Well, that seems to me an argument for doing something about mitigation. She had no doubt he was going to be convicted if it was a trial. And she did nothing to prepare a defense because she thought there wasn't any defense. So knowing that the chances that he would, you know, if the chances were zero, he wouldn't be convicted unless this lady died or went bonkers or something happened to her. So she knew that if there was a trial, the only hope she would have to save her client's life would be to look into mitigation. You know, that's not the same. Assume that in an ordinary trial you want to put your efforts into getting an acquittal. Here she didn't have to put any efforts into getting an acquittal. So all she had to worry about was mitigation if he got convicted. Sounds like hindsight. Sounds like foresight to me. If you were given this case, I know what you would do. And the only hope you had to save his life would be mitigation. You'd go all out for mitigation. I would follow the course that Stoller and Victor did in an attempt to get mitigation specialists, attempt to get funding. But, you know, they were appointed in June. Victor doesn't make that motion until January. I mean, they were slow off the mark, too. But that's not, the test isn't how fast you begin to do the investigation. Well, of course the test is how fast you begin if time makes a difference. And it makes a big difference for mitigation. We know from Ms. Durand, for example, that most death penalty defendants are a little slow to come around to the idea of revealing family history and so on. And you need time to sort of talk to them, get them used to the idea. And her figure was, well, out of 150, 149 have come around. But you need to start early. You've got testimony from Larry Hammond, who knows death penalty practice in Arizona as well as anybody, who says any competent death penalty practitioner starts out on two tracks, guilt and mitigation. Yes. Starts out, doesn't finish up. Starts out. Yes. As you recall, Williamson had another attorney who was appointed to help her with the mitigation. And what did they do? Zippo. That's correct. They did nothing at that point. But also, again, you need to. They did nothing. Ms. Williamson, they did nothing at any point. And she had the case for a year and a half. But the question is the circumstances that they're working under. Now, Victor had conversations with Kayer prior to being appointed to the case. Kayer wanted Victor on the case. At the time Stoller and Victor got on the case, the trial date was approaching. And so they were focusing more on the trial, which was understandable. Well, you know, they've got to walk and chew gum at the same time. I mean, if you're doing capital defense, you know that you've got to start your mitigation in a timely way. Well, and again, the lens that you're looking at this particular issue is through the EPA lens, which is you're not to substitute your judgment, but to determine whether or not there was the state court's judgment was objectively unreasonable. More than that, that they improperly, unreasonably applied Strickland and submit that that didn't occur in this case. Now, let me ask you a question that we asked a version of it to your adversary. Assume for a moment, again, I'm asking you to consume rather than concede, assume for the moment that there was defective performance on that part of Strickland. Does that mean, and that the trial judge, the PCR judge, Judge Kiger, unreasonably found both as a factual matter and as a legal matter that there was sufficient performance under Strickland. Does that mean we review the entire IAC claim de novo? You do not. Or rather, the rest of it de novo, right? You do not, because in this case, the trial judge, Judge Kiger, not only found that the performance was not constitutionally deficient, but also found that there was no prejudice, even if the performance was. So you have two state court findings. Yeah. And I read both. And for the second finding, that is to say the lack of prejudice, I was trying to figure out what Judge Kiger was comparing in his head for lack of prejudice. I mean, prejudice is, well, this happened. If this had happened, something else would have made a difference. I'm having trouble figuring out what he means by the something else. As he said no prejudice, was he applying the causal nexus test or not? I don't recall Judge Kiger specifying. No, he did not specify, which is why I'm wondering about that. Right. I would say that what he was doing after sitting through the evidentiary hearing for a number of days, nine days, decided that what he heard there was not significantly different than what had been presented at the sentencing, and therefore there was no prejudice. But I'm asking you a different question. Maybe you just have to say I don't know and we can't find out. I'm trying to figure out if he was applying the causal nexus test. I mean, is he repeating the Eddings error when he says no prejudice on the IAC? There's nothing in the record that supports that assumption or speculation. Well, he doesn't say one way or the other, right? Right. There's nothing in the record that supports that. And if he is repeating the Eddings error, then what? Do we review the de novo because he's applying the wrong standard? I apologize, Your Honor. I'm a little confused. I'm not trying to be confused. But the area is difficult, I understand, conceptually difficult. Yes. I don't – if we assume that he's applying McKinney error, which he – because he's a trial court, he wouldn't be applying the McKinney error. So he's applying the causal nexus. Eddings error. Is he applying the causal nexus test? We'll say it that way. Okay. Yeah. And if we assume that he is doing that, then what was the question? Well, what happens is at the original sentencing hearing, there's virtually no attempt to satisfy the causal nexus test with this sort of background evidence, the mental problems, the drinking problems, the gambling problems, the heart attack. And the trial judge concludes, as does the Arizona Supreme Court on direct review, that there's virtually no evidence presented of causal connection. So what's left that they can consider in mitigation is essentially nothing or, you know, very, very little. So now in the PCR proceeding, we get lots and lots of evidence. And a lot of that evidence that comes in is specifically directed to causal nexus. So when the judge says, well, it wouldn't have made any difference. Is he allowing it in only because of causal nexus? And I'm trying to figure out if he says, I'm only allowing and considering for purposes of prejudice. I'm only allowing it in if it's causal nexus. Then I'm left to wonder, okay, well, what evidence is he actually considering? And what's my standard of review if he's making an Eddings error at the PCR stage? Well, I think he's looking at this body of evidence, and he found originally that they hadn't proved that it existed. I think a reasonable reading of the record is that they didn't prove that he had a significant mental problem following the PCR proceedings. Is that understandable? Well, that may be the best we're going to do. If the court has any other questions. No, thank you very much. Okay. Well, thank you, Your Honors. It's been a pleasure. Thank you for coming. Whenever you call. Thank you. I have a few of the things I did not have at my fingertips previously. Judge Reinhart, Mr. Kayer's heart attack occurred on October 24th, 1994, which was less than six weeks before the crime in this case occurred. And that's available at ER 996 and 762 is where that's discussed in the record. As to the question about the review of the remaining portion of the claim, if you look at page 41 of the opening brief, there's a list of cases there that discuss between Panetti, Lafler v. Cooper, cases that discuss how the court reviews a claim following a finding that D had been satisfied. And so hopefully those will maybe explain my point better than I did. Excuse me? I didn't quite follow what you were saying. It's page 40 of the opening brief. There's a list of claims that are listed for the purpose of discussing the 2254 D analysis and the fact that the analysis after D has been satisfied that the review is de novo. Well, actually, let me just make sure I understand what you're saying here. Because you're saying that in Strickland there's cause and there's prejudice. So just so I'm clear, you're saying that if we find that the state court blew it on cause, then we can immediately go to de novo review of prejudice. It would be de novo review of the entire claim, Your Honor. Yes, I do. I believe that that is correct. However, I don't think that it matters in this case. I certainly don't think it's a dispositive question here. Because regardless, I think Mr. Kare can meet the strictures of D as to the prejudice finding by the PCR court as well. And that's another area where this case is very much on all fours with the Porter decision. Okay, so help me out. Review for us all of the evidence that comes in in the PCR hearing that is above and beyond the evidence that was previously presented. Now, I don't know whether when I say evidence previously presented, I have to be evidence previously presented that should have been admitted because of editings or whether evidence previously presented but not considered because of the court's causal connection. So for the moment, let's ignore that question and just focus on, okay, what's all the good evidence for him in mitigation? Absolutely, Your Honor. There's several categories, larger categories of information that were presented, starting with the evidence regarding his bipolar disorder. So although Mr. Kare's mother and his sister did talk a little bit about their lay observations of Mr. Kare that would potentially be attributable to bipolar disorder, during the post-conviction investigation and proceeding, there are experts which he's formally diagnosed with bipolar disorder that also explains exactly how that would have affected Mr. Kare's decision-making and the events in his life. They explain and present evidence that Mr. Kare might have been manic at the time of the crime, based on the evidence that they reviewed. They provided evidence that Mr. Kare displayed symptoms of bipolar disorder as a child, including mood swings, grandiosity, difficulty sleeping. They reviewed the military record and compared the military record to the psychiatric diagnoses of Mr. Kare to explain the problems that he had in the military and how they relate to his bipolar disorder. There are court records from Mr. Kare's prior conviction that was an aggravator in this case, showing what his mother had told the court in that case at sentencing for the underlying crime, and specifically asking the court in that case not to impose jail time but to impose probation because she wanted Mr. Kare to be able to continue receiving medication and treatment for the bipolar disorder. However, the court did sentence him to prison and he was not treated for his bipolar disorder while he was in prison on that crime. There are the medical records and evidence supporting his two trips to the Veterans Administration Hospital, including the first time, which was in 1983, where he was suicidal and asking for help. The second trip to the Veterans Administration, in which he was hospitalized for 19 days by the Veterans Administration, prescribed lithium and an antidepressant, an additional diagnosis of bipolar disorder and showing what effect it was having on Mr. Kare and why he needed the medication. There are DOC records that show that Mr. Kare has suffered from depression and suicidal thoughts and been treated for manic depression both the times that he has been in prison. Jail records that include evidence of that as well. As far as other mental health conditions, there was also evidence presented of a family history of bipolar disorder, which is crucial evidence because bipolar disorder does have a genetic component. And there was also a family history in this case, evidence of which was presented at the PCR hearing, that three other members of Mr. Kare's family had a history of hearing voices. Let's assume for a moment that you're right, that he was bipolar and he had a drinking problem, alcohol addiction, and he had a gambling addiction. Assume all of that. I'm always thinking, what's the next court going to think about this case, right? Yes, Your Honor. And so what case can we point to that has mitigation evidence similar to this one, and I don't think Porter's the case, that we can say, see, Supreme Court, we're good, here's why we're good, because here's the case you decided has mitigation evidence similar to this, and it was reversed under AEDPA. It was reversed under AEDPA. I would like to request the opportunity to brief that if I could, because I think I could give quite a few examples following the oral argument. Well, you can do a 28-J letter, but it seems to me that, I mean, from where I am in this case, that's where I'm at right now. I think on performance, I don't think there's a defensible argument by the State. But on the prejudice part, that's where, for me, the rubber really hits the road, and if AEDPA applies to that, if we're going to survive later review, we need some really good ammunition, and I don't think Porter's the case because it's so easy to distinguish Porter. So if you don't have him right now, you know, soon. No, absolutely, Your Honor. And I certainly think that it is a, this is a defensible case. The disparity between the evidence that was presented. If there is such a thing at the next level. I hope that there is. Some of us try. Some of us try. I hope that there is, Your Honor. I think the sheer disparity of the, between the evidence that was presented here and the. Well, you might try adding in what you seem to have just discovered, that the heart attack he had was six months before. Six weeks. Six weeks, I'm sorry. Six weeks before. Yes. And that he was in a state of depression fearing that he had not long to live because it was a family history of heart attacks. And he thought he might be about to die in the near future. Absolutely, Your Honor. And I definitely agree that that's a critical factor. I think if you look at, I think, any number of Supreme Court cases in recent years that have granted relief, for example, Wiggins v. Smith or Rompia v. Beard, in those cases many of the facts are on all fours with the facts in this case. But there was some small amount of mitigation that was presented, but that the disparity between what was presented and what was available justified. Well, let's see the other part. I don't think you can just look at mitigation without comparing it to the type of aggravating. When you have bad aggravating, you need a lot more mitigation. When you have very weak aggravating, you need less mitigation. Absolutely, Your Honor. So you might keep that in mind at the same time. Absolutely, Your Honor. The test that the Supreme Court. I thought that was something that would have been fully explored and in the briefs by now. I believe there is discussion of the aggravating factors and the way they need to be in the opening brief, and the fact that in order to make the determination about this claim, the court is required to look at the totality of evidence offered in mitigation and weigh it against the aggravation. Well, still, I think you might go back and see if you can satisfy Judge Owens that there is a case with the same type of mitigating circumstances that has been found to be sufficient to overcome the aggravating circumstances and submit us a letter within the next 10 days or so, which gives Judge Owens the information he'll need to persuade them at the higher level. Because here's my concern from your position is that this schiotti, it's a Ninth Circuit case, and they shoot a guy who's peeing on the side of the road. And here's another case where they shoot a guy who's peeing on the side of the road. Haven't we told you Ninth Circuit if it's a guy who gets shot peeing on the side of the road, we're not going to grant relief? It's a very easy case to announce. Now, I think you've pointed out there are some differences. But to get to where you want to be, we need, at least for me, we need more. Because I agree, performance is not the issue for me. It's that other part. I see that this schiotti case, and I go, uh-oh. So distinguishing that case and bringing in more cases showing why it's different for me is crucial. If you want this case, if you want to get the result you want here, but moreover, you know, death penalty cases the Supreme Court tends to look at. Yes, Your Honor. Especially from the State of Arizona. We are very aware. We are very aware of that, Your Honor. Now, here's an argument that occurs to me based upon the accurate description by your adversary of the Arizona Supreme Court's decision on direct review. I'm now just reading from the Arizona Supreme Court. But the record shows that the evidence, the existence of impairment from any source is at best speculative. Further, the court says, no causal nexus. In other words, on direct review, the Arizona Supreme Court says, he's not shown by a sufficient amount of evidence, by a sufficient amount of proof, any impairment whatsoever. It therefore makes it quite hard, the second time around, when all of a sudden we get the evidence coming in at the PCR stage is actually pretty convincing of impairment. It's hard to say, well, that evidence is merely cumulative, because the first time around the evidence was entirely discounted as not proven. So all of a sudden we have evidence of impairment for purposes of legal consideration, whereas before we had none. Yes, Your Honor. I definitely, I agree that there is a difference. I thought you might agree to that. I agree that there is a difference in the way that the trial court discussed this mitigation evidence versus how it was discussed by the Arizona Supreme Court. If you look at the trial court special verdict laying out its analysis, it is very clear that the reason why the trial court is finding the evidence to not exist or not have been proven, what was not proven was the causal nexus. No, no, you're missing my point. The Arizona Supreme Court says two things. Number one, you've not proven mental impairment. And further, even if there were mental impairment, you've not shown a connection. And I'm saying, well, now in the PCR standing, they've proved a lot of mental impairment. So the difference when we're comparing before and after for purposes of prejudice, before there was no cognizable evidence of mental impairment. And now we have some. Yes, Your Honor. I'm sorry, I misunderstood. Yeah, I thought you did. I misunderstood the point you were making there. I think that is correct. And it is certainly also, I think, it is a difficult question. And I agree with my colleague that it is a difficult question as to whether the PCR court applied a causal nexus to the new mitigation that was presented at the post-conviction hearing. That is, I think, not at all clear because of the brevity of that decision. However, there's no reason to think that the trial court did not continue to apply the same causal nexus standard with regard to what was presented in the trial court. No, I didn't. I'm sorry. I just didn't understand what you said. I don't think we can know for the new evidence presented during the post-conviction proceeding if the court required a causal nexus as to that new evidence. I just don't think that's clear in any way. However, the court was required to combine that evidence with what was introduced at trial in order to weigh that against the evidence in aggravation. And we have every reason to believe the trial court continued its Eddings error, the causal nexus error from the trial when looking at that evidence. So I think the fact that that wasn't found at the trial level, I think that that part of the error certainly did continue into the analysis of the IAC claim. Okay. Thank you. Now, do you understand that Judge Owens would like you to send us the names of cases that you think have the type of mitigation that's like this mitigation? Absolutely, Your Honor. And just give us a list of the cases. And then I don't think you'll have to respond if we don't have any argument about it, if we just have a list of cases. But if you got that and you want to send in something. Absolutely. And cases, just cases, because I'm not asking them to make any arguments from the cases. That's what we have briefs for. But if you want to send us some cases in response, be my guest. That would be helpful.  Thank you, Your Honor. And I'm glad you had a good trip from Arizona. It's good to see you again. And thank you also. Thank you very much, Your Honor. Court will stand in recess or adjourned for the day. All rise.
judges: Reinhardt, W. Fletcher, Owens